| | |
|---|---|
| ANWAR ARMSTRONG, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> NAVIENT SOLUTIONS, LLC, <br><br> *Defendant.* | Civil Action No. 16-2212 (RDM) |

## MEMORANDUM OPINION AND ORDER

In 2014, Plaintiff Ann Holiday received a statement from Navient Solutions, Inc. ("NSI"), a loan servicing company, reflecting a balance of $45,000 for multiple student loans purportedly made to her son, Plaintiff Anwar Armstrong. Asserting that they took out a single student loan for only $9,000, Plaintiffs allege that they contacted NSI to dispute the account balance and that NSI failed to correct the error. Instead, according to Plaintiffs, NSI reported the incorrect loan balance to consumer reporting agencies, which, in turn, used the faulty information from NSI to generate credit reports that negatively affected Armstrong's ability to secure employment.

In response, Plaintiffs filed suit in the Superior Court of the District of Columbia, alleging that NSI violated the District of Columbia Consumer Protection Procedures Act ("CPPA") by making a "misleading statement . . . regarding their credit worthiness and credit balances." Dkt. 2-2 at 4 (Compl. ¶ 14). They also asserted common law claims for negligence and breach of contract, alleging that NSI "breached its duty of care by failing to safeguard [Plaintiffs'] information, and failing to correct errors in their account balances," *id.* at 6 (Compl.

¶ 26), and breached its contract with Plaintiffs by "not revers[ing] or adjust[ing] erroneous charges . . . and [by] assert[ing] an invalid account balance," *id.* at 5 (Compl. ¶ 20). NSI removed the action to this Court, and now moves to dismiss under Federal Rule of Civil Procedure 12(b)(6). *See* Dkt. 5. NSI asserts that all three of Plaintiffs' claims are preempted by the federal Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq.*, and, alternatively, that Plaintiffs have failed to state a claim upon which relief can be granted.

For the reasons explained below, the Court concludes that the FCRA preempts Plaintiffs' CPPA and negligence claims in part. In addition, the Court concludes that any non-preempted portion of Plaintiffs' negligence claims fails to state a claim, as does Plaintiffs' claim for breach of contract. With respect to the non-preempted portion of Plaintiffs' CPPA claim, it is unclear whether Plaintiffs have alleged facts sufficient to sustain Article III standing. The Court will, accordingly, grant NSI's motion to dismiss in part and deny it in part, and will direct that the parties show cause why the remaining portion of Plaintiffs' CPPA claim should not be dismissed (or remanded) for want of jurisdiction.

## I. BACKGROUND

For purposes of the pending motion to dismiss, the following facts taken from Plaintiffs' complaint are accepted as true. *See Am. Nat'l Ins. Co. v. FDIC,* 642 F.3d 1137, 1139 (D.C. Cir. 2011).

Plaintiffs Holiday and Armstrong allege that they "entered an agreement for student loan credit" with NSI, Dkt. 2-2 at 5 (Compl. ¶ 18) for the amount of $9,000, *id.* at 3 (Compl. ¶ 2 (Statement of Facts)). In December 2014, however, Holiday received a statement from NSI reflecting a balance "due [of] over $45,000" for "multiple private student loans" allegedly made to Armstrong. *Id.* at 3 (Compl. ¶ 1). Plaintiffs alleged that they requested proof of the claimed

2

loans but that NSI failed to "produce any executed promissory notes evidencing the loans that [it] claimed were owed," *id.* (Compl. ¶¶ 3–4), and that NSI failed to credit $8,460 in loan payments already made by Plaintiffs, *id.* at 4 (Compl. ¶ 6). Plaintiffs further allege that NSI failed to correct the erroneous loan balance and "continue[d] to falsely claim that" Plaintiffs "owe[d] amounts that they [did] not owe." *Id.* at 3 (Compl. ¶¶ 2, 5). Although the complaint is not a model of clarity, Plaintiffs also appear to allege that NSI reported the incorrect balance-owed to consumer reporting agencies, which, in turn, used the information they received from NSI to generate negative credit reports about Armstrong. *Id.* at 4 (Compl. ¶ 14) (NSI "misled" Plaintiffs and "others" about the loan balance). "[B]ecause of [those] credit report[s]," Plaintiffs allege, Armstrong was not offered two jobs that he applied for in 2015. *Id.* at 4 (Compl. ¶¶ 7–10).

Plaintiffs filed suit against NSI in the Superior Court of the District of Columbia in 2016. Dkt. 2-1 at 2. NSI removed the case to this Court pursuant to 28 U.S.C. §§ 1332, 1441, and 1446, Dkt. 2 at 1–3. On November 14, 2016, NSI moved to dismiss the complaint, arguing that "[a]ll of the Plaintiffs' claims . . . [we]re preempted by the [FCRA]," and, alternatively, that they "fail[ed] to state a claim upon which relief c[ould] be granted." Dkt. 5 at 1.

## II. LEGAL STANDARD

A motion to dismiss brought under Federal Rule of Civil Procedure 12(b)(6) is designed to "test[] the legal sufficiency of a complaint." *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). In evaluating such a motion, the Court "must first 'tak[e] note of the elements a plaintiff must plead to state [the] claim' to relief, and then determine whether the plaintiff has pleaded those elements with adequate factual support to 'state a claim to relief that is plausible on its face.'" *Blue v. District of Columbia*, 811 F.3d 14, 20 (D.C. Cir. 2015) (quoting *Ashcroft v.*

3

*Iqbal*, 556 U.S. 662, 675, 678 (2009)) (alterations in original) (citation omitted).

Although "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), "a complaint must contain sufficient factual matter, [if] accepted as true, to 'state a claim to relief that is plausible on its face,'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). A plaintiff can survive a Rule 12(b)(6) motion even if "recovery is very remote and unlikely," but the facts alleged in the complaint "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555–56 (quotation marks omitted).

### III. ANALYSIS

**A.     Preemption**

   1.     *The Fair Credit Reporting Act*

"Congress enacted the FCRA in 1970 to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 52 (2007). The FCRA imposes duties on consumer reporting agencies ("CRAs") and on entities that furnish information about borrowers to CRAs.[1] *See* 15 U.S.C. § 1681s-2. Although the FCRA does not define "furnisher," courts have noted that "[t]he most common . . . furnishers of information are credit card issuers, auto dealers, department and grocery stores, lenders, utilities, insurers, collection agencies, and government agencies." *Himmelstein v. Comcast of the Dist., LLC*, 931 F. Supp. 2d 48, 52 (D.D.C. 2013) (citing *Chiang*

---

[1] "The term 'consumer reporting agency' means any person which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports." 15 U.S.C. § 1681a(f).

*v. Verizon New Eng., Inc.*, 595 F.3d 26, 35 n.7 (1st Cir. 2010)). Here, NSI is a "furnisher" within the meaning of the FCRA because it allegedly provided information about Plaintiffs' loan balances and "creditworthiness" to CRAs, which then used that information to generate credit reports. *See* Dkt. 2-2 at 4 (Compl. ¶ 14); Dkt. 5 at 12; Dkt. 9 at 9.

It is a violation of the FCRA to "furnish any information relating to a consumer to any [CRA] if [the furnisher] knows or has reasonable cause to believe that the information is inaccurate" or to "furnish information relating to a consumer to any [CRA] if (i) the [furnisher] has been notified by the consumer . . . that the specific information is inaccurate[,] and (ii) the information is, in fact, inaccurate." 15 U.S.C. § 1681s-2(a)(1). In addition, one who "regularly and in the ordinary course of business furnishes information to one or more [CRAs] about [the furnisher's] transactions or experiences with any consumer" have a duty to correct and to update any credit reporting information that the furnisher "determines is not complete or accurate," and, "[i]f the completeness or accuracy of any [such] information . . . is disputed . . . by a consumer, the [furnisher] may not furnish the information to any [CRA] without notice that such information is disputed by the consumer." *Id.* § 1681s-2(a)(2) & (3). If a consumer notifies a CRA that she disputes the accuracy of an item, the FCRA requires the CRA to notify the furnisher, who, in turn, must "conduct an investigation with respect to the disputed information;" "report the results of the investigation to the [CRA];" and, "if the investigation finds that the information is incomplete or inaccurate, report those results to all other [CRAs] to which the person furnished the information and that compile and maintain files on consumers on a nationwide basis." *Id.* § 1681s-2(b).

When it was enacted in 1970, the FCRA expressly preempted state common law claims "in the nature of defamation, invasion of privacy, or negligence with respect to reporting of

information against any . . . person who furnishes information to a [CRA]." 15 U.S.C. § 1681h(e), Pub. L. 91–508, title VI, § 601, 84 Stat. 1131. The scope of that provision, however, was limited by a proviso, which allowed claims to proceed if the information was "furnished with malice or willful intent to injure [the] consumer." *Id.* In 1996, however, Congress returned to the question of preemption under the FCRA. Although Congress did not repeal the preemption provision adopted in 1970, it added a new and more comprehensive one. That provision, which is codified at 15 U.S.C. § 1681t(b), provides in relevant part:

> No requirement or prohibition may be imposed under the laws of any State—(1) with respect to any subject matter regulated under—
> . . .
> (F) section 1671s-2 of this title, relating to the responsibilities of persons who furnish information to consumer reporting agencies . . . .

Pub. Law 104–208, Div. A, Title II, § 2419, 110 Stat. 3009 ("Preemption of State Law").

A number of courts have puzzled over the interplay between the 1970 and 1996 preemption provisions. *See, e.g.*, *Macpherson v. JPMorgan Chase Bank, N.A.*, 665 F.3d 45, 47–48 (2d Cir. 2011); *Purcell v. Bank of Am.*, 659 F.3d 622, 625–26 (7th Cir. 2011); *Himmelstein*, 931 F. Supp. 2d at 56–60; *Manno v. Am. Gen. Fin. Co.*, 439 F. Supp. 2d 418, 423–29 (E.D. Pa. 2006); *Johnson v. Citimortgage*, 351 F. Supp. 2d 1368, 1373–75 (N.D. Ga. 2004); *Vazquez-Garcia v. Trans Union De Puerto Rico*, 222 F. Supp. 2d 150, 159–63 (D.P.R. 2002). Some have held that the 1996 preemption provision "only preempts state claims arising *after* a furnisher of information receives notice of a dispute;" others have held that the 1996 preemption provision applies to statutory claims, while the 1970 provision applies to common law claims; and still others have held that 1996 provision "preempts all related state-law causes of action against furnishers, even willful violations of state common law." *Himmelstein*, 931 F. Supp. 2d at 57–59. The last of these readings of the statute gives the FCRA the broadest preemptive sweep, and

6

it has garnered the support of the two most recent circuit court opinions addressing the issue, *Macpherson*, 665 F.3d at 48; *Purcell*, 659 F.3d at 625–26, as well as recent opinions from this Court, *Himmelstein*, 931 F. Supp. 2d at 60; *Rivera v. JPMorgan Chase Bank*, 140 F. Supp. 3d 88, 93 (D.D.C. 2015). For the reasons explained below, the Court is persuaded by the reasoning in those decisions.

First, as explained in *Himmelstein*, the first theory—which posits that the 1996 provision preempts only state law claims arising after a furnisher of information receives notice of a dispute—is untenable. 931 F. Supp. 2d at 57–58. It finds no support in the text of the statute, and it would "perversely afford[] 'a furnisher of information more protection from exposure to liability for acts committed after receiving notice of dispute than for acts committed before such notice." *Id.* (quoting *Johnson*, 351 F. Supp. 2d at 1375).

The second theory—which posits that the 1996 provision preempts state statutory law but not state common law—is "slightly more attractive." *Id.* at 58. According to those courts that have adopted this approach, the phrase "*requirement[s]* or *prohibition[s] . . . imposed* under the laws of any State" is most naturally construed to refer to state statutory law; the phrase "would be an awkward, roundabout way of forbidding state courts" from interpreting or applying state tort law. *Manno*, 439 F. Supp. 2d at 426. They add, moreover, that the absence of any mention by Congress of § 1681h(e) at the time it enacted § 1681t suggests that it viewed the two provisions as distinct—one governing tort claims, and the other governing statutory claims. *Id.*

The problem with this theory is that the Supreme Court considered and rejected a similar argument in *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504 (1992). In that case, the Court was called upon to construe the preemption provision contained in the Public Health Cigarette

7

Smoking Act of 1969. Using language similar to the language Congress used in the 1996 FCRA preemption provision, the Public Health Cigarette Smoking Act provided:

> No *requirement or prohibition* based on smoking and health shall be imposed *under State law* with respect to the advertising or promotion of any cigarettes the packages of which are labeled in conformity with the provisions of [the Public Health Cigarette Smoking Act].

15 U.S.C. § 1334(b) (emphasis added). Construing this language, the *Cipollone* plurality first rejected the contention that "common-law damages actions do not impose 'requirement[s] or prohibition[s]." 505 U.S. at 521. As the plurality explained: "The phrase '[n]o requirement or prohibition' sweeps broadly and suggests no distinction between positive enactments and common law; to the contrary, those words easily encompass obligations that take the form of common-law rules." *Id.* The plurality then rejected the further argument that "the phrase 'imposed under State law'" refers to statutory law, and not common law. *Id.* at 522. To the contrary, as the Supreme Court observed, "[a]t least since *Erie R. Co. v. Tomkins*, 304 U.S. 64 (1938), [the Court] ha[s] recognized the phrase 'state law' to include common law as well as statutes and regulations."[2] *Id.* Providing a majority on this portion of the plurality's analysis, Justices Scalia and Thomas agreed that "the language of the Act plainly reaches beyond such [positive] enactments;" that "the general tort-law duties petitioner invokes against the cigarette companies can, as a general matter, impose 'requirement[s] or prohibition[s]' within the meaning of [the Act];" and that "the phrase 'State law' as used in that provision embraces state common law." *Id.* at 548–49 (Scalia, J., concurring in the judgment in part and dissenting in part).[3]

---

[2] Although at times, there may be good reason to give the phrase a narrower construction, the Court concluded that this history of the Public Health Cigarette Smoking Act counseled in favor of giving the phrase its generally accepted meaning. *Cipollone*, 505 U.S. at 522–23.

[3] Although a plurality gave the term "requirement" a narrower construction in *Medtronic, Inc. v. Lohr*, 518 U.S. 470 (1996), it did so only in light of the "implausib[ility]" that Congress would

Significantly, the Supreme Court decided *Cipollone* before Congress enacted the 1996 FCRA preemption provision. That is important for two related reasons. First, congressional intent is the ultimate touchstone of preemption, *Wyeth v. Levine*, 555 U.S. 555, 565 (2009), and courts generally assume that Congress is aware of the judicial precedent against which it legislates, *see Merck & Co., Inc. v. Reynolds*, 559 U.S. 633, 648 (2010). Second, as the Supreme Court wrote in *Riegel v. Medtronic*, "Congress is entitled to know what meaning [the courts] will assign to terms regularly used in its enactments." 552 U.S. at 324. The Supreme Court, accordingly, has admonished that, "[a]bsent other indication, references to a State's 'requirements'" should be construed to "include[] . . . common-law duties." *Id.*; *see also Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 443 (2005); *Williamson v. Mazda Motor of Am., Inc.*, 562 U.S. 323, 328–29 (2011).

Returning to the FCRA, the only "other indicia" of congressional intent is the fact that Congress did not repeal or mention the 1970 preemption provision at the time it adopted the 1996 provision (and, indeed, made an unrelated amendment to the 1970 provision, *see* Omnibus Consolidated Appropriations Act, 1997, Pub. L. 104–208, 110 Stat. 3009 (1996)). That fact, however, is far from compelling. As the Seventh Circuit has explained,

> we do not perceive any inconsistency between the two statutes. Section 1681h(e) preempts some state claims that could arise out of reports to credit agencies; § 1681t(b)(1)(F) preempts more of these claims. Section 1681h(e) does not create a *right* to recover for wil[l]fully false reports; it just says that a particular paragraph does not preempt claims of that stripe. Section 1681h(e) was enacted in 1970. Twenty-six years later, in 1996, Congress added § 1681t(b)(1)(F) to the United States Code. The same legislation also added § 1681s-2. The extra federal remedy

---

have intended to "preclude[] state courts from affording state consumers any protection from injuries resulting from a defective medical device." *Id.* at 487. And, in any event, "five justices concluded that common-law causes of action for negligence and strict liability do impose 'requirement[s]' and would be pre-empted by federal requirements specific to a medical device." *Riegel v. Medtronic, Inc.*, 552 U.S. 312, 323–24 (2008) (citing 518 U.S. at 512); *id.* at 503–05 (Breyer, J., concurring in part and concurring in the judgment).

> in § 1681s-2 was accompanied by extra preemption in § 1681t(b)(1)(F), in order to implement the new plan under which reporting to credit agencies would be supervised by state and federal administrative agencies rather than judges. Reading the earlier statute, § 1681h(e), to defeat the later-enacted system in § 1681s-2 and § 1681t(b)(1)(F), would contradict fundamental norms of statutory interpretation.
>
> . . . . [T]he statutes are compatible: the first-enacted statute preempts some state regulation of reports to credit agencies, and the second-enacted statute preempts more. . . . This understanding does not vitiate the final words of § 1681h(e), because there are exceptions to § 1681t(b)(1)(F). When it drops out, § 1681h(e) remains. But, even if our understanding creates some surplusage, courts must do what is essential if the more recent enactment is to operate as designed.

*Purcell*, 659 F.3d at 625.

The Court, accordingly, has little difficulty concluding that the 1996 FCRA preemption provision applies to both statutory and common law claims.

2.      *Plaintiffs' Inaccurate Reporting Claims*

Plaintiffs' CPPA claims challenge, in part, NSI's failure to accurately report their loan balance to CRAs. Plaintiffs allege, for example, that NSI's "representations . . . regarding the amount of the account balance" misled Plaintiffs "*and others*"—presumably the CRAs that generated negative credit reports about Armstrong—"regarding [Plaintiffs'] creditworthiness and credit balances," and that Armstrong lost employment opportunities "because of his credit report." Dkt. 2-2 at 4–5 (Compl. ¶¶ 7–10, 14–15).

These allegations implicate § 1681s-2's requirement that NSI "provide accurate credit information" and that it "investigate, report, and correct inaccurate information upon notice of a dispute." *Ihebereme v. Capital One, N.A.*, 933 F. Supp. 2d 86, 98 (citing 15 U.S.C. § 1681s-2(a)–(b)). And, as a result, they trigger the 1996 preemption provision, which bars claims "with respect to any subject matter regulated under . . . [S]ection 1681s-2 . . . relating to the responsibilities of persons who furnish information to" CRAs. 15 U.S.C. § 1681t(b)(1)(F). Accordingly, to the extent Plaintiffs' CPPA claims challenges NSI's disclosure of allegedly

10

inaccurate information to one or more CRAs, it is preempted by the FCRA. *See Ihebereme*, 933 F. Supp. 2d at 107 (dismissing as preempted the plaintiffs' claim that "defendants violated the [CPPA] by disseminating false information to credit bureaus").

For similar reasons, Plaintiffs' breach of contract and negligence claims are also preempted to the extent they challenge NSI's disclosure of inaccurate information to CRAs. Both of those claims allege that NSI failed to maintain accurate records regarding Plaintiffs' loans and loan balances, Dkt. 2-2 at 5–6 (Compl. ¶¶ 20, 26), and both suggest that, as a result of NSI's errors, Armstrong lost employment opportunities, Dkt. 2-2 at 4–6 (Compl. ¶¶ 8, 10, 21, 27). For the same reasons described above, those allegations implicate § 1681s-2, *see* 15 U.S.C. § 1681s-2(a)(1)(A) ("A person shall not furnish any information relating to a consumer to any [CRA] if the person knows or has reasonable cause to believe that the information is inaccurate."); *id.* § 1681s-2(a)(1)(B) ("A person shall not furnish information relating to a consumer to any [CRA] if . . . the person has been notified by the consumer . . . that specific information is inaccurate; and . . . the information is, in fact, inaccurate."). These claims are, therefore, preempted by § 1681t(b)(1)(F) as well.

**B.     Failure To State a Claim**

Without the preempted claims, all that remains of Plaintiffs' complaint is the allegation that NSI misreported information to the Plaintiffs themselves. For the reasons described below, that factual allegation fails to state a claim under D.C. common law or the CPPA.

1.     *Breach of Contract*

The complaint alleges that Plaintiffs "entered into an agreement for student loan credit" with NSI and that NSI "breached [its] contract [with Plaintiffs] because it did not reverse or adjust erroneous charges and/or payments and/or adjustments and asserts an invalid account balance." Dkt. 2-2 at 5 (Compl. ¶¶ 18, 20). Because Plaintiffs' credit reporting claims are

11

preempted, all that remains of this claim is their contention that NSI breached some contractual duty it owed them by misstating their account balance in correspondence with them. As currently pled, Plaintiffs' complaint fails to state a claim.[4] Under D.C. law, "[t]o prevail on a claim of breach of contract, a party must establish (1) a valid contract between the parties; (2) an obligation or duty arising out of the contact; (3) a breach of that duty; and (4) damages caused be [the] breach." *Brown v. Sessoms*, 774 F.3d 1016, 1024 (D.C. Cir. 2014) (quoting *Tsintolas Realty Co. v. Mendez*, 984 A.2d 181, 187 (D.C. 2009)). Plaintiffs' complaint fails to allege any contractual obligation or duty that protects Plaintiffs from incurring the "loss of time and convenience" stemming from contacting NSI to dispute an inaccurate account balance. Dkt. 2-2 at 4–5 (Compl. ¶¶ 11, 21). Nor have Plaintiffs alleged any recoverable damages flowing from NSI's alleged breach. For example, Plaintiffs claim that their injuries include "loss in creditworthiness" and "lost income and job opportunities," *id.* at 4 (Compl. ¶ 11), but those injuries could be caused only by NSI's reporting of allegedly inaccurate information to CRAs. And Plaintiffs' additional damages allegations—their claims for "emotional distress" and "punitive damages," *see id.*—are not cognizable under D.C. contract law.[5]

---

[4] The Court does not construe Plaintiffs' complaint as seeking a declaratory judgment establishing that they owe NSI only the $9,000 they allege they borrowed (less the $8,460 in payments they allege they made), rather than the "over $45,000" balance on their account statement. Dkt. 2-2 at 3–4 (Compl. ¶¶ 1–2, 6 (Statement of Facts)). To the extent that Plaintiffs seek such relief, they must seek leave to amend their complaint.

[5] *See Bond v. U.S. Dep't of Justice*, 828 F. Supp. 2d 60, 80 (D.D.C. 2011) ("Damages for emotional harm stemming from any breach [are] not recoverable under District of Columbia law." (citing *Asuncion v. Columbia Hosp. for Women*, 514 A.2d 1187, 1190 (D.C. 1986)); *Fed. Fire Protection Corp. v. J.A. Jones/Tompkins Builders, Inc.*, 267 F. Supp. 2d 87, 91 (D.D.C. 2003) ("Where the basis of [a] complaint is a breach of contract, it is the general rule in the District of Columbia that punitive damages are not recoverable, even if it is proved that the breach was willful, wanton, or malicious." (citing *Sere v. Group Hospitalization, Inc.* 443 A.2d 33, 37 (D.C. 1982); *Den v. Den*, 222 A.2d 647, 648 (D.C. 1966)).

Given Plaintiffs' failure to "plead[] th[e] elements" of a contract claim under D.C. law "with adequate factual support to 'state a claim to relief that is plausible on its face,'" *Blue*, 811 F.3d at 20 (quoting *Iqbal*, 556 U.S. at 678) (alterations in original), the Court will dismiss this portion of Plaintiffs' breach of contract claim without prejudice.

2. *Negligence*

Plaintiffs also allege that NSI was negligent because it failed "to exercise reasonable care in dealing with" Plaintiffs, failed "to disclose all material facts," and failed to "correctly report their account balance." Dkt. 2-2 at 6 (Compl. ¶ 24). To allege a negligence claim, a plaintiff must allege facts sufficient to show "(1) a duty, owed by the defendant to the plaintiff, to conform to a certain standard of care; (2) a breach of this duty by the defendant; and (3) an injury to the plaintiff proximately caused by the defendant's breach." *Findlay v. CitiMortgage, Inc.*, 813 F. Supp. 2d 108, 120 (D.D.C. 2011) (quoting *District of Columbia v. Fowler*, 497 A.2d 456, 463 n.13 (D.C. 1985)). The tort, moreover, "must exist in its own right independent of [any] contract, and any duty upon which the tort is based must flow from considerations other than [a] contractual relationship." *Carter v. Bank of Am., N.A.*, 888 F. Supp. 2d 1, 15 (D.D.C. 2012) (quoting *Nugent v. Unum Life Ins. Co. of Am.*, 752 F. Supp. 2d 46, 53–54 (D.D.C. 2010)). In other words, "[t]he tort must stand as a tort even if the contractual relationship did not exist." *Id.* (quoting *Nugent*, 752 F. Supp. 2d at 54).

Plaintiffs have failed to identify any authority recognizing a lender or servicer's non-contractual duty "to disclose all material facts" and "correctly [to] report . . . account balance[s]" outside a contractual relationship, and the Court can discern no basis for imposing such a duty. *Findlay*, 813 F. Supp. 2d at 120 ("The relationship between a debtor and a creditor is ordinarily a contractual one . . . ."). Accordingly, Plaintiffs have failed to allege a claim of negligence

13

against NSI independent from their contractual relationship, and the Court will dismiss this portion of Plaintiffs' negligence claim without prejudice.

        3.      *CPPA*

Finally, Plaintiffs assert that NSI violated the CPPA by "sending [an] inaccurate billing statement[] to Plaintiffs," thereby "misrepresent[ing] to them the amounts owed for private student loans." Dkt. 9 at 6; *see also* Dkt. 2-2 at 4 (Compl. ¶ 14) ("[NSI]'s representations . . . regarding the amount of the account balance . . . constitute a misleading statement . . . ."). It is not clear from the present record, however, whether Plaintiffs satisfy the requirements of Article III standing with respect to this claim. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998). Plaintiffs must plead, as an "irreducible constitutional minimum," that they have suffered "an injury in fact" that is both "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Lujan v. Def. of Wildlife*, 504 U.S. 555, 560 (1992) (internal quotation marks omitted); *see also Hancock v. Urban Outfitters, Inc.*, 830 F.3d 511, 214 (D.C. Cir. 2016) ("[A]n asserted injury to even a statutorily conferred right 'must actually exist,' and must have 'affect[ed] the plaintiff in a personal and individual way.'" (quoting *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1543, 1548 (2016)). "[A] lawsuit under the CPPA does not relieve a plaintiff of the requirement to show a concrete injury-in-fact to himself." *Silvious v. Snapple Beverage Corp.*, 793 F. Supp. 2d 414, 417 (D.D.C. 2011) (quoting *Grayson v. AT&T Corp.*, 15 A.3d 219, 244 (D.C. 2011)); *see also Mann v. Bahi*, 251 F. Supp. 3d 112, 119 (D.D.C. 2017) ("[I]f [the plaintiff] had only alleged that [the defendant] violated the CPPA without also alleging that he was misled or that he suffered any harm, that would not be sufficient.").

Here, Plaintiffs allege that they were injured as a result of NSI's "misleading statement" because they were "in fact misled," and, as a result, suffered "emotional distress" and "loss of time and convenience," for which they seek compensatory damages, statutory damages, and the

costs of suit and attorney's fees. Dkt. 2-2 at 4–5 (Compl. ¶¶ 11, 14, 16). Plaintiffs, however, offer no factual allegations that plausibly support the conclusion that they were misled about their loan balances; indeed, they allege that they brought NSI's error to the company's attention. *Id.* at 3 (Compl. ¶ 2 (Statement of Facts)). Moreover, the only relevant injuries that they allege are emotional distress and loss of time and convenience. Yet, "a plaintiff can . . . establish Article III injury in fact based on emotional harm" only if "that alleged harm stems from the infringement of some legally protected, or judicially cognizable, interest that is either recognized at common law or specifically recognized as such by the Congress." *Al-Aulaqui v. Obama*, 727 F. Supp. 2d 1, 25 (D.D.C. 2010) (internal quotation marks and citations omitted). And relevant precedent also counsels that a plaintiff's loss of time and convenience is not generally sufficient to establish standing, *see US Ecology, Inc v. U.S. Dep't of Interior*, 231 F.3d 20, 25 (D.C. Cir. 2000), nor is the cost of bringing suit, *see Steel Co.*, 523 U.S. 83 at 107. Notwithstanding these serious issues, neither party has addressed the question of whether Plaintiffs have alleged facts sufficient to establish injury in fact, and, until the Court is satisfied that it has Article III jurisdiction, it cannot reach the merits of Plaintiffs' CPPA claim.

Accordingly, the Court will deny NSI's motion to dismiss as to the non-preempted portion of Plaintiffs' CPPA claim and will order that the parties show cause why that claim should not be dismissed for lack of jurisdiction.

## CONCLUSION

For the reasons explained above, Defendant's Motion to Dismiss, Dkt. 5, is hereby **GRANTED** in part and **DENIED** in part. It is hereby **ORDERED** that the parties show cause on or before March 30, 2018 why the remaining portion of Plaintiffs' CPPA claim should not be dismissed (or remanded) for want of jurisdiction. It is further **ORDERED** that the parties shall

15

appear before the Court on April 17, 2018 at 2:00 p.m., in Courtroom 21 to address the standing issue and discuss appropriate next steps.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date: March 2, 2018